(65 Misc. Rep. 263.)

## FULTON LIGHT, HEAT & POWER CO. et al. v. STATE.

(Court of Claims of New York.   December, 1909.)

1. EMINENT DOMAIN (§ 84*)—CANALS—RIGHTS ACQUIRED BY STATE—COMPENSATION.

Where the Oswego river, opposite the lands of claimants for compensation for land and water taken for the Barge Canal, was not navigable in fact, and the state acquired the land and water necessary for the old Oswego Canal under Laws 1817, c. 262, and there is no grant or award

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

showing what rights the state deemed necessary for the purpose, that fact must be determined by recourse to what was actually done, and such acts showing that the rights of the state extended only to such water as was required for the canal then constructed.   Where an opening was left in the state dam then built, through which claimants' predecessors, who at that time had a wing dam at that place and were using the water from it, might draw water to supply their mill and flume, it will be presumed that such use of the surplus water flowing therefrom was a right granted claimants' predecessors at the time of the state's appropriation, and it will also be presumed that such predecessors had a permanent right to the maintenance of a second aperture in existence for over 40 years, from which they also drew water, so that claimants would be entitled to compensation for the water admitted to their power plant through the aperture not needed or acquired by the state, and the state cannot appropriate for the Barge Canal, which is a new artificial waterway, such surface waters used by claimants without compensation, and, the statute under which the appropriation was made providing for the compensation, it must be made regardless of the possible right of the state to take the water without compensation therefor.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 84.*]

2. EMINENT DOMAIN (§ 320*)—ESTABLISHMENT OF CANAL—NOTICE OF APPROPRIATION—EFFECT.

Notices of appropriation, duly filed or served as required by the statute, providing for construction of the state canal system, operate to transfer to the state the interests described therein, and notices of the appropriation of all of certain persons' water rights are not affected by the fact that the plans of the proposed improvement show that there will be surplus waters not required for such improvement at times of high water, which such persons might use without prejudicing the state's interest.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 320.*]

3. PROPERTY (§ 1*)—DEFINITION.

"Property," in the strict legal sense, is an aggregate of rights which are guaranteed and protected by the government, and, in the ordinary sense, indicates the thing itself, rather than the rights attached to it.

[Ed. Note.—For other cases, see Property, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

Claim by the Fulton Light, Heat & Power Company and another against the State for property taken for the Barge Canal.   Judgment for claimants.

See, also, 62 Misc. Rep. 189, 116 N. Y. Supp. 1000.

Hugo Hirsch (Charles A. Collin, John P. Wells, W. D. Gaillard, G. C. Warner, Geo. J. Gillespie, N. R. Holmes, F. B. Hunt, James T. Clark, and R. H. Goldsborough, of counsel), for claimants.

Edward R. O'Malley, Atty. Gen., for the State.

RODENBECK, J.   This is a proceeding taken by the state pursuant to chapter 147 of the Laws of 1903 and its amendments, commonly referred to as the "Barge Canal Act," to acquire certain land and water which the claimants allege they own.   The act was approved by the people at the general election held in the year 1903, and outlines the general course of the improved canals of the state and the means for acquiring the rights of way and supply of water necessary therefor.

In the acquisition of land or water under the statute, the state takes possession of such property rights as it desires, files a map thereof, and

serves a copy upon the owner; and, if no agreement for compensation can be made under the act and pursuant to chapter 195 of the Laws of 1908, known as the "State Appraiser's Act," this court is given jurisdiction of the claim.

In pursuance of this authority, the state took possession of the land and water alleged to be owned by the claimants at the existing dam in the Oswego river at the city of Fulton, known as "state dam No. 4," filed the required maps, and served upon one of the claimants, the Fulton Light, Heat & Power Company, on August 6, 1906, and October 2, 1906, copies of the maps which had been filed.

There are three pieces of property involved in the claim, to each of which it is alleged there are attached certain riparian rights. The most southerly of these properties is situated at the easterly end of the dam and on the pier which forms an easterly extension of the dam and is the so-called power plant station, the notice of appropriation of which was served, as stated, October 2, 1906, and, beside describing specifically by metes and bounds the land actually appropriated, contains the words, "also all the right, title and interest of the said reputed owners in the land in the bed of the river on the area above described and also all of their right, title and interest as riparian owners." The next piece of property, proceeding northerly, and which is situated on what is known as the hydraulic canal connected with the slack water created by the dam, is the Kenyon mills property, the notice for the appropriation of which was served October 2, 1906, and contains a description of the land taken, but omits the clause contained in the notice just referred to relating to riparian rights. The third piece of property is known as the Genesee mills property, and is also situated on the hydraulic canal, the notice for which was served August 6, 1906, and contains the same clause relating to land in the bed of the river and to riparian rights that is to be found in the notice appropriating a part of the power plant station property.

The claimants are before this court claiming compensation for the land and water described in the notices of appropriation, and the state disputes their claim upon the ground that the claimants have no interest to condemn, notwithstanding the service of the notices, because, among other reasons, the land described in the notices is in the natural bed of the Oswego river, title to which was never acquired by grant, deed, or otherwise by the claimants, because the Oswego river at the point in question is a stream navigable in fact, and because the work constitutes an improvement of the navigability of the stream and the state can interfere with the land and water occupied and used by the claimants without making compensation to them under its power to improve navigation.

The property, as stated, is situated on the easterly side of the Oswego river, which is fed by the waters of a series of lakes in the central part of the state, and flows into Lake Ontario. It has a large watershed and is of very uniform flow. From Lake Ontario it was navigable in fact in its natural state from the lake for some distance to a rapid above which the stream was again navigable.

The nonnavigable part of the river upon which claimants' property is situated, between the two navigable reaches, seems never to have

been capable of navigation. There is no evidence that any boats or even logs were floated down the river in its natural state; but, on the contrary, it appears that at the Oswego Falls, which was the name given to the falls south of the claimants' property, there existed a portage around the falls, and the state itself did not attempt in the past to use this part of the river for the old Oswego Canal, and even the present improvement contemplates a by-pass around the dam at claimants' property, which was heretofore erected by the state in the construction of the original Oswego Canal.

Prior to any interference with the river by the state and on May 10, 1793, the state executed a grant to Philip Stene of 200 acres of land bordering upon this unnavigable portion of the Oswego river, by a description which began:

"At a white ash sapling marked on the southerly side W. H. and on the northerly side C. S. standing on the east shore of said Oswego river, and running thence east forty-four chains, then north forty-five chains, then west forty-eight chains to the said river, and then up along the same to the place of beginning."

Under this description, which embraced the land of the claimants herein, and following the decisions of the courts, this court held by a previous decision in this claim (62 Misc. Rep. 189, 116 N. Y. Supp. 1000) that the title extended to the center of the river.

Long before the state began the construction of the first Oswego Canal in 1824, there existed at the present location of the state dam No. 4 at Fulton, a promontory or tongue of land, extending somewhat into the river from the east bank, upon which a sawmill had been erected as early as the year 1818 and from which promontory, to supply water to the mill, a wing dam had been built into the river nearly to its center. In this condition of things the state found the river when it constructed the first Oswego Canal, and beside the sawmill and wing dam the state found, when it began the construction of the canal, an old wooden flume, 12 or 15 feet wide, and 200 feet long, extending north along the bank of the river and connecting with the head of water created by the wing dam.

The state authorities at that time evidently thought that the project of the construction of the canal would so appeal to the citizens of the state that grants of the necessary rights of way and water privileges would readily be acquired by gift; so the statute of 1816 (chapter 237) provided for the acquirement of such rights by grant and donation. This procedure, however, having been found insufficient, the state passed in the following year chapter 262 of the Laws of 1817, authorizing the canal commissioners to take possession of the necessary land and water and provided the means for securing compensation therefor. This statute enacted that the state might take the land and water "necessary" for the improvement, "doing nevertheless no unnecessary damage." Section 3.

The state, however, did not arrive at the actual construction of the canal until about the year 1824, and, during that year and succeeding years, the work was prosecuted to completion. The length of the canal was 23½ miles and extended from Three Rivers Point to Lake Ontario, a distance by a straight line of about 13 miles. It utilized 10½

miles of the navigable portions of the Oswego river for its purposes, and, where the stream was such that it could not be navigated, the state erected dams and ran its canal around these portions.    Thus there were constructed seven dams, with the distances between them as follows:   Three Rivers to Phœnix, 2.5 miles;  Phœnix to Upper Fulton, 9 miles;  Upper Fulton to Lower Fulton, ¾ mile;  Lower Fulton to Battle Island, 2¾ miles;  Battle Island to Minnetto, 3 miles;  Minnetto to High Dam, 2¼ miles;  High Dam to Curve Dam at Oswego, 2¼ miles;   Curve Dam to Lake Ontario, 1¼ miles. · The length of the river channel used for the old Oswego Canal was 10.5 miles, and for the improved canal about 20 miles will be used.    One of these dams, known as "dam No. 4" at Fulton, was built opposite the property in question. This dam was about 12 feet high, extended across the river, and was connected at its easterly end with the high bank by means of a pier somewhat higher than the dam itself.    In order to accomplish the construction of this dam and the connecting pier, it was necessary to take possession of land owned by claimants' predecessors in the bed of the river and upon the east bank of the river, upon which land the dam and pier were constructed.    This dam and pier set back the water in the river at this point and created a pond in connection with the canal, which was used at times by boats in crossing to the opposite side of the river.    The canal itself, however, south of claimants' land, was built along the east edge of the river and was separated from the pond by a boom of logs;  the towpath being cut out of the east high bank of the river.    If the state had simply looked to its own improvement, the canal and its necessary dam and pier at this point would obviously have cut off the water power of the mill referred to, by the destruction of the wing dam and the closing of the wooden flume;  but the state did not regard the destruction of these rights as "necessary" and, being authorized by the statute to take only such land and water as were "necessary," "doing nevertheless no unnecessary damage," it did not take all of the riparian rights, but made provision for the future use of water by the owner of the sawmill and the owners of water rights on the flume.    In the execution of this purpose it left an opening in the pier to supply water to the mill and another opening for the admission of water into the flume.    The southerly wall of the mill was also allowed to rest upon the pier.    This was the condition in which things were left after the completion of the original canal in 1828.

At the time of the construction of this and other dams, the state evidently considered that it was the owner of the surplus water created by the erection of the dams;  and, in pursuance of this conception of its rights, it sought to lease the additional power created at the various dams.    In August, 1826, the acting commissioner on the Oswego Canal sold at public auction surplus water in the Oswego Canal at the east end of dam No. 4;  but, on account of claims to the water by Norman Hubbard, the then owner of mills at the dam, no certificate of sale was given, and the sale was relinquished, and the payment of the note given was never made or enforced.    In the following December of the same year, in pursuance of chapter 112 of the Laws of 1823, the owners of water power at the dam executed a bond to the state to keep in repair the flume above referred to.    Other disputes arose in connection with

the attempts of the state to lease water power, and its right to do so came before the Court of Chancery in the case of Varick v. Smith, decided upon a demurrer in 1835 (5 Paige, 137, 28 Am. Dec. 417), and upon the merits in 1842 (9 Paige, 547). In this case the complainant Varick was the owner of land and a mill on the west side of the river, and Smith was the owner of land and a mill on the east side of the river. The state had leased to Smith all of the water of one of the state dams not needed for the canal. Varick brought suit against Smith, making the Attorney General a party, to have the lease to Smith adjudged null and void and to restrain Smith from intercepting the water in its descent from the dam, alleging that Smith was preventing the water from flowing over the dam to Varick's mill on the west side of the river. The court held that the state had no claim to surplus waters passing over the state dam, and thus the claim of the state to the surplus waters of the river passing over its dams passed away.

The state continued to operate the canal as constructed at the premises in question until 1843, when some changes were made. The flume, or, as it will now be called, the "hydraulic canal," was widened, a new westerly wall was constructed of masonry, and the headgates were set back about 25 feet. There was also constructed a guard lock in the canal, opening into the pond created by the dam. The purpose of this improvement, part of the expense of which was paid by the state and part by the citizens of Fulton, seems to have been to allow boats to pass from the canal into the pond and then into the hydraulic canal, thus securing access to the parcels of land concerned in this claim.

No further changes in the canal were made by the state affecting the claimants' premises, until the improvement of 1857, whereby the canal was widened and deepened and its level along the river south of the state dam at Fulton was raised three feet. In place of the wooden boom that separated the old channel from the channel of the river, an embankment was constructed.

Differences having arisen between the water right owners on the hydraulic canal, an action was brought in 1889 in the Supreme Court to determine the respective proportions of water which the several parties on the hydraulic canal were entitled to use. The state was not a party to this suit, but all of the predecessors in interest of the claimants herein and all persons then using or claiming to have any right to use the waters of the Oswego river drawn from the dam or the hydraulic canal were made parties. The decree made in this action, entered March 28, 1891, is known as the Churchill decree; and by it the respective rights of the parties to use such water was classified in the order of priority of right, and the amount of classified water owned by each party was defined as the flow through a specific number of square inches of aperture under a 12-foot head. The waters not so classified were designated as "surplus." By this decree the then predecessors of claimants were adjudged to own all the first class water, certain third, fourth, and fifth class waters, and all the surplus. The total amount of the water to which all of the parties were entitled was adjudged to be equivalent to 1,457.91 cubic feet per second of flow; and the amount to which the then predecessors of the claimants

were entitled was equivalent to 510.19 cubic feet per second under a 12-foot head. The state, as above mentioned, was not a party to this action; and it merely determined the rights of the parties thereto as between themselves upon certain assumptions.

From the time of the construction of the original Oswego Canal down to the time of the appropriation for the barge canal, the claimants have continued to occupy the land and use the water not needed by the state without any interference, except that on occasions the mill owners were required to shut down their mills in order to provide a sufficient depth of water in the pond back of the dam to enable boats to cross the pond. The claimants continued to use the water of the river without question, except as stated, through the openings for the mill and flume provided when the original canal was built, except that some time thereafter another opening was made by the state in the pier so that, at the time of the present appropriation, the claimants had two openings in the pier, each separated by dividing timber, and the right to a further opening in the hydraulic canal to supply their premises with 510.19 cubic feet per second of flow. The water thus used was discharged through the tailraces into the river. In this condition of things the state, as above mentioned, served notices of appropriation, taking from the claimants certain land and all their riparian rights.

The barge canal follows substantially the line of the old canal. It will have the same number of dams as the old canal, but their location will be somewhat changed. The barge canal occupies 20 miles of the river channel, and 3½ miles are taken up with canal channels around the dams. The total length of the canal will be 23½ miles from Three Rivers Point to Lake Ontario.

Upon this state of facts, questions arise as to whether or not the claimants have any property subject to appropriation for which they are entitled to compensation, and, if so, the extent of these rights, and, finally, the compensation to which they are entitled therefor.

In ascertaining the property rights owned by the claimants, it is necessary to bear in mind the sources of the titles to the land and water of the state, for these titles have not all had the same origin, nor are they all to be determined by the same principles of law. The original inhabitants of the territory now comprising the state were not regarded by European nations as having any title to the land and water which they possessed, but were considered merely as occupants thereof; and, when these nations journeyed here, they claimed title to the land and water by virtue of the right of discovery. They then held the land and water according to the law which prevailed in the mother country; and, as this law differed in various nations, there are some differences in the extent of ownership covered by the grants and conveyances. By the law of the Netherlands, a conveyance upon a fresh water stream did not carry with it title to the center of the stream, and so we find the state claiming title to the bed and water of the Mohawk river; whereas, by the common law of England, such a conveyance as of right carried the title usque ad filum. All of the land and water not conveyed by them to others were held by the respective governments as sovereigns; and, when one nation superseded another in its dominion over the territory, the rights of the former subjects over the

territory were respected, and they continued to hold the land which had been conveyed to them under the title which had been acquired under the laws of their respective countries. By virtue of the Revolution the people of the state of New York became the owners of the land and water previously held by the British government; but at the same time the title to property which had been previously conveyed by the British government to others was respected, except where the owner had been guilty of treason, in which case his land was declared forfeited. Likewise the titles acquired from other nations than the British government held by loyal inhabitants were protected by the new state. Laws 1779, c. 25, § 14; Public Lands Law (Consol. Laws, c. 46) § 4.

The new state Constitution provided that nothing contained in it should be construed to affect any grants of land within the state made by the authority of the king or his predecessors (State Const. 1777, art. 36); and, at the same time, the Constitution made applicable to the new state such parts of the statute law of England and Great Britain and of the common law of England as formed the law of the colony on April 19, 1775, subject to such alterations and provisions as the Legislature might from time to time make. State Const. 1777, art. 35. Until modified, therefore, by statute or by the common law of this state, the title to all land and water conveyed by the state government after the Revolution was construed according to the rules of law governing the state at the time. The statute law of England and Great Britain ceased to have any force after May 1, 1788 (General Construction Law [Consol. Laws, c. 22] § 70); but the common law continued with diminishing force as the body of the common law of this country expanded. At the time of the grant to Stene, in 1793, however, the common law of England was in full force and was applicable to the grant, there being at that time a very inconsiderable body of common law peculiar to the new government. The language of the grant, "beginning at a sapling standing on the shore and running to the river and up along the river," under the decisions then in force, conveyed as of right title to the center of the river. It was not then a matter of presumption, but one of right; and this condition of the common law at the time of the Stene patent must be considered in interpreting its language.

By a former decision this court held that the language of the Stene patent above quoted carried the title to the center of the river, and ample authority is cited in the opinion heretofore rendered (62 Misc. Rep. 189, 116 N. Y. Supp. 1000) sustaining that view of the interpretation to be given to the grant. It is not for this court to disregard the decisions of the courts in the interpretation of the Stene patent, or to adopt any new theory of riparian rights, in order to enable the state to acquire a water supply for the new barge canal without compensation and in derogation of the rights of property heretofore recognized, but rather to adhere to the principles of law applicable to the facts of this case as laid down by the authorities. Lewis, in his work on Eminent Domain, says, of the decisions in New York on riparian rights, that:

"The common-law doctrine may be said to prevail, except as to the Mohawk and Hudson." Section 72.

Gould, in his work on Waters, referring to the New York decisions on riparian rights, says:

"The later decisions follow the common-law rule, which has been held applicable to the Hudson, the Oswego and the Genesee rivers." Section 57.

Gould on Waters says:

"If the intention to limit the title to the bank does not appear from other terms in the instrument, a description of a riparian estate, by which a line runs to a monument on the bank, and thence, 'by,' 'with,' 'along,' or 'on,' the river, carried title to the thread of the stream, and thence follows the meanders thereof; the monument merely determining the direction of the line towards the river." Section 197.

In People v. Platt the headnote says:

"By the patent granted to Zephaniah Platt in 1784, of a tract of land bounded east on Lake Champlain, and extending west, on both sides of the river Saranac, seven miles square, the whole river, to that distance, passed to the patentee, and became his exclusive property; there being no reservation of the river, nor any restriction in the use of it expressed in the grant." 17 Johns. 195, 8 Am. Dec. 382.

And, in Shively v. Bowlby, the United States Supreme Court said:

"By the law of England, Scotland, and Ireland the owners of the banks prima facie own the beds of all fresh water rivers above the ebb and flow of the tide, even if actually navigable, to the thread of the stream usque ad filum aquæ. * * * The rule of the common law on this point appears to have been followed in all the original states—except in Pennsylvania, Virginia, and North Carolina, and except as to great rivers such as the Hudson, the Mohawk and the St. Lawrence in New York—as well as in Ohio, Illinois, Michigan, and Wisconsin." 152 U. S. 31, 14 Sup. Ct. 559 (38 L. Ed. 331).

The rule is well stated by Judge Adams in De Camp v. Thomson, 16 App. Div. 531, 44 N. Y. Supp. 1016, affirmed 159 N. Y. 444, 54 N. E. 11, 70 Am. St. Rep. 570:

"It is undoubtedly a well-settled principle of law, and one which has for many centuries been incorporated into the common law of England, as well as of this country from its earliest history, that fresh water streams which are nonnavigable, in the sense that they are not affected by the ebb and flow of the tide, belong to the riparian owners, subject, nevertheless, to a paramount right in the public to use the same for the transportation of such craft or property as can be floated upon their waters in their natural state."

The common law of England which was generally applicable in 1793 was not strictly adhered to later on; and it was soon strongly contended that it had no application to the conditions which prevailed in the new state, where there were large inland fresh water streams and bodies of water in which the tide did not ebb and flow and with reference to which it did not seem reasonable to hold that the owners of the land upon the shores owned of right title to the center of the stream or body of water. People v. Canal Appraisers, 33 N. Y. 461.

The foregoing authorities, with those cited in the former opinion of this court and the long-continued adverse possession of claimants and their predecessors, establish and confirm in them an absolute title in fee to the land described in their deed as extending to the center of the river, subject to such rights as the state subsequently acquired for the

old Oswego Canal down to the time of the appropriation for the barge canal, and subject to the rights of other riparian owners on the hydraulic canal.

There have gradually grown up under the decisions of the courts four classes of ownership with respect to streams and bodies of water within the state.

The first class relates to those streams and bodies of water which are absolutely owned by the state as public property, of which it has the absolute disposition, both as to the land and as to the water itself. An illustration of this class of ownership is represented by certain titles along the Mohawk river, in litigation concerning which it has been held that the owners acquired no rights in the streams at all, and that, so far as they are concerned, the bed of the stream and its waters belonged to the state and were subject to its absolute disposition. To what extent these cases apply to other conveyances along the stream has not been determined. Canal Appraisers v. People, 17 Wend. 571; People v. Canal Appraisers, 33 N. Y. 461; People v. Page, 39 App. Div. 110, 56 N. Y. Supp. 834, 58 N. Y. Supp. 239.

A second class is that in which the state owns the bed of the stream and a public easement in its waters. Illustrations of this qualified ownership are found in the case of the Hudson river, where the tide ebbs and flows, and titles along the shore of which have been held to be governed by the common-law rule that they extend only to high-water mark, in the absence of an express conveyance of the bed by the legal owner of the bed. Rumsey v. N. Y. & N. E. R. R. Co., 114 N. Y. 423, 21 N. E. 1066; Langdon v. Mayor, 133 N. Y. 628, 31 N. E. 98; Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Knickerbocker Ice Co. v. Shultz, 116 N. Y. 382, 22 N. E. 564; People ex rel. Howell v. Jessup, 160 N. Y. 249, 54 N. E. 682; Smith v. Bartlett, 180 N. Y. 360, 73 N. E. 63; Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665. In this class must also be placed those streams and bodies of water, nontidal in character, which form a boundary between this state and other states and Canada, like the Niagara and St. Lawrence rivers and Lake Champlain. Champlain & St. L. R. R. Co. v. Valentine, 19 Barb. 484; Matter of Com'rs of State Reservation at Niagara, 37 Hun, 537.

A third class is that where the upland owner has the title to the bed of the stream and the public have an easement in its waters. This class is represented by those rivers and bodies of water which are not tide water, but which, in their natural condition, are navigable in fact for boats, logs, and the like. This claim is far more numerous than the other two that have been mentioned and finds many illustrations. Varick v. Smith, 5 Paige, 137, 28 Am. Dec. 417, and Id., 9 Paige, 547 (Oswego river); Van Buren v. Baker, 12 N. Y. St. Rep. 209 (Oswego river); Commissioners of Canal Fund v. Kempshall, 26 Wend. 404 (Genesee river); Waller v. State, 144 N. Y. 579, 39 N. E. 680 (Skaneateles Lake); Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393, and Neal v. City of Rochester, 156 N. Y. 213, 50 N. E. 803 (Hemlock Lake); Chenango Bridge Co. v. Paige, 83 N. Y. 178, 38 Am. Rep. 407 (Chenango river).

A· fourth class is that where the state has no interest whatever and where the stream is the subject of absolute private ownership. This class takes in all the smaller streams and bodies of water which are not navigable in fact. No question in these cases arises between the riparian owner and the state, but litigation is confined to the rights of the various riparian owners upon the stream among themselves.

At one extreme lies that class where the state has the absolute ownership of the bed and the water of the stream, and at the other that where the individual has the absolute ownership, so far as the state is concerned, to the bed and water of the stream; and between these two lie those classes, each subject to the public easement, in one of which the state and in the other of which the upland owner has the title to the bed of the stream or body of water.

In construing the rights of the owner of land upon streams and bodies of water, confusion will result, unless certain principles which modify these rights are borne in mind. The first of these is that which makes his riparian rights subject to those of other owners on the stream. Within reasonable limits he will not be permitted to divert the water of the stream or pollute it to the damage of other riparian owners. His right, therefore, to use the water, as between him and other riparian owners, is not an absolute one, but is confined to such a reasonable use of the water, as it passes his premises, as will not injure other riparian owners on the stream. This applies to all of the foregoing classes; for, where the interests of the state are not invaded, the law will protect the rights of one individual as against another.

There is, however, a sovereign right, resting in the people of the state, with respect to water courses, which modifies riparian rights of individuals. This sovereignty relates to the right of the state to improve the navigation of streams and bodies of water. The federal Constitution invests Congress with the power to regulate commerce with foreign nations and among the several states, and this comprehends the power to improve navigation for that purpose. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. Under this power the state may remove obstructions in its tidal streams or those streams navigable in fact, and may make other changes in the streams, subject, however, to making compensation where property recognized as such under the Constitution is taken. Thus it was held in Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592, that under this sovereign power the state could improve the Harlem river, a tide-water stream, and remove a pier which had been built out into the stream below low-water mark, without making compensation therefor. So, in Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126, it was held that the state of Michigan in the improvement of Sault Ste. Marie might erect a pier upon submerged lands away from but in front of the upland of a riparian owner, without making compensation for the interference with his right of access. Again, in Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996, it was held that a dike might be constructed in the Ohio river, reducing the flow of water in front of the property of a riparian owner, without liability for compensation to him, where the dike was constructed for the purpose of improving the navigation of the stream. ·

The rights of the state, however, with respect to improving naviga-tion, are subject to the further principle that no private property can be taken for public use without just compensation.   Const. U. S. Amend. 5;  Const. N. Y. art. 1, § 6.   The application of these provisions de-·pends upon the facts in each case, and the decisions interpreting this language of the Constitutions are very numerous.   In Commissioners of Canal Fund v. Kempshall, 26 Wend. 404, it was held that the state could not divert the water of the Genesee river for the purposes of the Erie Canal, to the detriment of a riparian owner, without making compensation.   In Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393, it was held that the state could not authorize the city of Rochester to divert water from Hemlock Lake for the purpose of sup-plying the city with wholesome water, to the detriment of riparian owners at the outlet of the lake, without making compensation.   Waller v. State, 144 N. Y. 579, 39 N. E. 680; Lakeside Paper Co. v. State, 15 App. Div. 169, 44 N. Y. Supp. 281.   In Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557, it was held that the state of Wisconsin could not, under its authority to improve the navigation of a river, turn water upon the land of a riparian owner without making compensation. In United States v. Lynah, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539, and in Lowndes v. U. S. (C. C.) 105 Fed. 838, a similar ruling was made, where the land affected was injured by percolation through levees.

The contention between the state and private owners, in cases re-lating to riparian rights on streams navigable in fact, turns upon the question as to whether or not the stream or body of water is a navigable stream, in fact; for, if it is not a navigable stream, in fact, the author-ities are agreed that, unless expressly reserved in the grant or convey-ance, the title to the bed of the stream passes with the title of the up-lands, and becomes the private property of the owner of the bank, and is not subject to the power of the national or state government to im-prove commerce or navigation.   No interference by an individual or· by the government with such a stream which affects riparian rights can be made, without making compensation to persons damaged thereby; but the difficulty often consists in determining whether or not a partic-ular stream is to be treated as one which is navigable in fact, a question which is one both of law and of fact, but chiefly one of fact.

This court found in its previous decision (62 Misc. Rep. 189, 116 N. Y. Supp. 1000) that the portion of the Oswego river opposite claim-ants' property was not and never had been navigable in fact.   No evi-dence has been introduced to show that this part of the river in its natural state had ever been used for the transportation of the products of the soil or of the forest, or for commerce of any kind.   It appeared that, when the state constructed the original Oswego Canal, the canal was carried around this part of the river.   The state used a part of the Oswego river for the canal, but at no time has the part opposite claim-ants' premises been used for through transportation up or down the river.   The position taken by the court, that the river opposite claim-·ants' premises is not to be treated as navigable in fact, is well supported by the authorities.

"A stream is a public highway wherever it is suitable in its natural condition for general use in travel or in the transportation of property." Gould on Waters, § 107.

"Streams which are not floatable, or cannot, in their natural state, be used for the carriage of boats, rafts, or other property, are absolutely private." Id., § 108.

"A stream, to be 'navigable' within the authorities, must furnish a 'common' passage for the king's people,' must be of 'common or public use for carriage of boats and lighters,' must be capable of bearing up and floating vessels for the transportation of property, conducted by the agency of man." Munson v. Hungerford, 6 Barb. 270.

"It is not necessary that the stream should be navigable through its whole length. The public may use such portions of it as are navigable." Curtis v. Keesler, 14 Barb. 518.

"The true rule is that the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks." Morgan v. King, 35 N. Y. 459 (91 Am. Dec. 58).

It is evident from the foregoing considerations and the decisions of the courts that the Oswego river at the premises of the claimants is to be treated as a stream not navigable in fact, and that the interpretation heretofore given by this court to the Stene grant conforms to the ruling authorities in this state.

The rights acquired under the Stene patent, however, have not come down to the claimants, since the state, by appropriations made since the Stene patent, has acquired certain land and riparian rights included within the terms of the patent. In determining what these rights are, this court must follow the adjudications heretofore made by the courts as it finds them and not formulate any new doctrine. The rights of the parties must be determined by reference to the facts and the established decisions of the courts. The difficulty of determining the rights of the parties since the appropriations by the state for the old Oswego Canal lies in the fact that no grant of land or water rights affecting these premises was made under the act of 1816 (chapter 237) and no appraisement was made pursuant to the act of 1817 (chapter 262); and, as there are no living witnesses to recount the actual transactions as they occurred at that time, reliance must be had upon the acts of the parties themselves, interpreted in the light of such documentary evidence as is available. One of the facts that assists in determining the rights acquired by the state and those that remained in the claimants is the statute under which the rights of way for the original canal were acquired. This statute, enacted in 1817, provided that the state might acquire such land and water as might be "necessary" for the canal, "doing nevertheless no unnecessary harm." Laws 1817, c. 262. It seemed to be the intention of this act that only such rights should be acquired by the state as were necessary for the proposed canal, and that in acquiring those rights no unnecessary harm should be done; but there is no grant or award showing what rights the state regarded as necessary, and recourse must be had to what was actually done.

Certain maps have been produced in evidence showing blue lines which are intended to indicate the land taken by the state for the old canal, but these maps do not define the riparian rights that the state acquired. When it began the construction of its canal in 1825, claim-

ants' predecessors were in possession of the uplands and owned the fee of the bed of the river. The state removed the wing dam, extending nearly to the center of the river, and in its place substituted a dam built across the river, furnishing a head of about 12 feet. It connected by a pier the east end of the dam with the east high bank of the river, allowed claimants' predecessors to rest their sawmill upon this pier, and placed openings in the pier for the supply of water to the mill and also to the old wooden flume which previously existed. No map has been produced the blue line of which incloses the dam or pier, but their construction and maintenance by the state, in view of the statutes applicable, have long since given the state title to the land upon which they stand. The state did not interfere with the land underneath the pond created by the dam, but has by long user acquired a permanent right to flood these lands by back water from the dam. Although the appropriation made by the state was not followed by an appraisement, as required by the statute of 1817 (chapter 262), the state acquired the right to use so much of the water of the Oswego river as was necessary for the operation of the canal, reserving for the claimants' predecessors such portion of the remainder of the water as was available through the openings which it left in the pier. It was evidently thought at the time by claimants' predecessors that this supply of water, with the additional head furnished by the new dam, would compensate them for such damages as they sustained; and it does not appear that any effort was made, either by them or by the state, to secure an appraisement. Any objection arising from the absence of a grant or appraisement has long since been cured, and the title of both parties has become fixed by lapse of time. The statute of 1825 (chapter 275) provides for the adjustment of all unsettled claims, but contains this limitation upon the presentation of claims:

"But no claims for damages shall be acted upon by the said appraisers unless the same be presented to them before the first day of January, one thousand eight hundred and twenty-seven." Section 1.

The Revised Statutes of 1830 provided that no claim for damages for land that had been previously appropriated to the use of the state should be received by the appraisers, unless it should have been exhibited within one year after the Revised Statutes took effect, and that the premises so appropriated should be deemed the property of the state. Rev. St. (1st Ed.) pt. 1, c. 9, tit. 9, art. 3, § 49. Likewise the statute of 1866 (chapter 836) provided that claims for past damages should be filed "within one year after jurisdiction shall be conferred upon the canal commissioners," etc. Section 5. By virtue of these statutes, any claim for damages for the taking of any land or water for the construction and enlargement of the old canal has long since lapsed, and the state has acquired a fee in such land and a permanent usufruct in such water. This property right includes the land upon which the dam stands, the dam itself, the water of the river (including the water in the pond created by the dam) necessary for the operation of the old canal, the additional land flooded by the pond, an easement of flowage over the land covered by the pond and any land within the blue lines laid down on duly authorized maps of canal lands; for by statute these

maps are "presumptive evidence that the lands indicated on said maps as belonging to the state have been taken and appropriated by the state as land for the canals," etc. Laws 1837, c. 451, § 6.

Obviously it was not deemed necessary by the state to take from the claimants' predecessors all of the water of the Oswego river. This would have been accomplished had the state constructed the dam and pier from bank to bank, without openings for the mill and flume; and, had this course been taken by the state, the claimants would not be in a position to insist that the state in building the Barge Canal should provide openings for the surplus water of the river. The appropriation of land and water by the state at this dam and the provisions for supplying the mill and flume with water were contemporaneous transactions; and the use of water by claimants' predecessors and by claimants is not by virtue of a license from the state which may be revoked at any time, but is a matter of right granted at the time of the state's appropriation. In the absence of any written grant or an appraisement, the same principles that should apply to the rights acquired by the state must be extended to the rights reserved by the claimants' predecessors and acquired by the claimants. If no openings had been left at the time of the appropriation, it might very well be claimed that the use of the water by the claimants was a mere license from the state; but under the circumstances it seems clear that the right to maintain the openings is a permanent one, growing out of the appropriation made when the canal was constructed and confirmed by subsequent acts. Just as the rights of the state became fixed by the appropriations of 1826 and 1857, so also did those of claimants; and, as the state cannot acquire more land or water for the enlarged canal without making compensation, so the claimants cannot secure water in addition to that which can find its way upon their property through the openings existing at the time of the appropriations, for the same statutes that control the rights of the state also fix those of the claimants.

Claimants' predecessors were compensated for the water rights which they lost when the wing dam was destroyed by the state by the appropriations made for the old canal which allowed them to draw water from the river under the increased head provided by the new dam. Without this provision they would not have been in a position as of right to claim the benefit of any increased head created by the erection of a dam higher than the original wing dam. Any power thus created belonged to the state, and they were not at liberty to draw upon this power without making a return to the state. Kaukauna Water Power Co. v. Green Bay & Miss. Canal Co., 142 U. S. 254, 12 Sup. Ct. 173, 35 L. Ed. 1004. In the present instance the land and water taken by the state for the old canal were paid for by the provision for using the increased head of water not needed by the state. In the Varick Case the court said, with reference to the power created by the erection of the dam:

"Such a head of water being created for the legitimate purposes of public improvements, no one has the right to tap the state dam so as to draw off any portion of the artificial pond without the consent of the Legislature or its legally authorized agents." 5 Paige, 158 (28 Am. Dec. 417).

The situation in the Varick Case differs from that in the present case, since the claimants' predecessors were on the site of the dam, and the state in its appropriation considered this fact and adjusted its appropriation accordingly, by making provision for the use by the claimants of such water as it did not need.

That this was the view of the parties is evidenced by the transactions which occurred subsequently to the construction of the canal. The state claimed the right to the power created by its dams, and in 1823, by chapter 112 of the Laws of that year, provided for the use of such power. See, also, Rev. St. (1st Ed.) pt. 1, c. 9, tit. 9, art. 5, § 80. It sought to apply this statute to the case of claimants' predecessors, and undertook, in the year 1827, to sell at public auction the surplus waters at the east end of the dam and did actually sell these waters; but, on account of the claims of the claimants' predecessor, the owner of mills on the dam, no certificate of sale was given, and in the same year a bond was given by him to keep the flume in repair. These facts show that the state recognized the rights of claimants' predecessors to use the water of the river, without requiring any lease or making any other compensation. This view is also confirmed by the decisions in the Varick Case, made in 1839 and 1842. 5 Paige, 150, 28 Am. Dec. 417; Id., 9 Paige, 559. That case did not involve a situation exactly like the one at bar, since the principal question involved there was whether or not the state could sell the water of the river not needed for its canal to the injury of a lower riparian owner. This the court held could not be done, and in making the decision it said:

"In this particular case, the state has the absolute and exclusive right to the land on which the dam is built, and to the dam itself. It has also an absolute and exclusive right to so much water as is necessary to be diverted for the supply of the Oswego canal, and by necessary consequence it has a temporary and usufructuary right to all the water in the dam, as a means of keeping an adequate supply for actual diversion, and it has a partial right to the land on which the water flows." 9 Paige, 560.

"What then, under the provisions of this act, in the case under consideration, was taken and appropriated to the public use? Clearly all the land and water which were necessary for the improvement which the commissioners were then prosecuting. In other words, they took all the land and water necessary for the furnishing of an adequate supply of water for the Oswego canal." 9 Paige, 559.

"The eightieth section of the title of the Revised Statutes relative to the canals (1 R. S. 231) does not appear to apply to such a case. The object of that provision of the statute was to give to the owner of mills, adjacent to a state dam. the benefit of a head of water created at the expense of the state, so far as the water was not wanted for state purposes; upon the payment by such mill owner of a reasonable equivalent therefor. Such a head of water being created for the legitimate purposes of public improvement, no one has a right to tap the state dam, so as to draw off any portion of the artificial pond, without the consent of the Legislature or its legally authorized agents. So far as the raising of the artificial pond, for the use of the public, has the effect, either wholly or in part, to divert the natural flow of the water from the original bed of the stream below the dam, the law has made provision for compensating those who are injured thereby. But whatever remains of the stream, beyond what is wanted for the public improvement, and which continues to flow over the dam and down the original channel of the river, unquestionably belongs to the owners of water rights upon the margin of the stream below; in the same manner as if the state dam had not been erected." 5 Paige, 158, 159 (28 Am. Dec. 417).

These views are further confirmed by the acts of the state in 1843, when the hydraulic canal was enlarged and changes made in the canal so as to allow boats to pass from the canal into the pond and then into the hydraulic canal, and by the improvement of the canal in 1857, under which the canal was deepened and widened and the existing rights of the state and claimants' predecessors re-established.

The foregoing relates particularly to the original openings in the dam pier—that is, the opening for the sawmill and for the flume—but applies in some measure to the additional opening in the pier which existed at the time of the present appropriation. When the state served its present notices of appropriation, there were, in addition to the opening for the hydraulic canal, two openings in the dam pier, substantially 12 by 12 feet in extent. One of these openings has been traced by the evidence to the time of the construction of the original canal, between the years 1826 and 1828; but the exact time of the construction of the second opening does not clearly appear. Its existence has been carried back to the year 1865, which is over 40 years ago; but the transactions under which the opening was constructed do not appear, and the court is left to determine the status of the parties with respect to this opening by such facts and statutes as exist, confirmed in its conclusion by a user of 40 years. There is no evidence before the court to show that the construction of the second opening was due to any license from the state; and, on the other hand, it does not appear that it formed a part of any specific appropriation made by the state. Some changes were made in the canal about this property when the canal was enlarged in 1857, and it may be that the additional opening was constructed at that time. However, there is no doubt that it was built by some agreement with state officers, and that it has existed since its construction without objection. At the time that the second opening was constructed, there existed undoubted authority in state officers for its construction; and such water as it admitted into the power plant was not water owned by the state, but was such water the use of which the state did not need or acquire and the use of which belonged to the claimants. Even before the construction of the old Oswego Canal, the state, anticipating that it would create considerable water power by the erection of dams, made provision for leasing surplus water. The surplus water referred to could mean only such surplus water as the state acquired and could not refer to water which was owned by private parties and which had not been acquired by the state for the use of the canal. In considering the rights of the claimants, it must always be borne in mind that their predecessors were at a point on the Oswego river where they had created a head of water by means of a wing dam, which water and dam they were using at the time that the state entered upon the scene, and which were recognized in all the statutes and by the common law as property which could not be taken from them, except upon due compensation in money or its equivalent. Laws 1823, c. 112; Laws 1828, c. 21, § 1, pars. 384, 545; Rev. St. (1st Ed.) pt. 1, c. 9, tit. 9; Laws 1831, p. 437; Laws 1839, c. 316; Laws 1840, c. 292; Laws 1894, c. 338, art. 6; Laws 1909, c. 13, art. 7 (Consol. Laws, c. 5).

In view of these considerations and the existence of the second aperture for more than 40 years, it seems a fair conclusion that the claimants have a permanent right·to its maintenance which enables them to insist upon compensation for such water as it will admit to their power plant and which is not needed and was not acquired by the state.

The view here taken of the rights of the respective parties is further confirmed and recognized by the present proceedings under which the state seeks to acquire, so far as the·power plant and Genesee mills properties are concerned, all of the right, title, and interest "in the land in the bed of the river" and "also all of their right, title and interest as riparian owners."

The rights which claimants thus acquired through the previous appropriations of the state are property rights.  "Property," in the strict legal sense, is an aggregate of rights which are guaranteed and protected by government.  In the ordinary sense, it is used to indicate the thing itself, rather than the rights attached to it.  Whether or not we employ the term in one or the other of these senses, the result is the same, so far as the interference with property is concerned; for, while in the former attention is directed to the rights which make up the thing, in the latter the thing which constitutes the aggregation of these rights is emphasized.  In both cases the rights attached to the thing are the subject of concern.  A reference to the cases in the courts will show the various rights which have been protected under the name of property, but which, in reality, are rights attached to something which in the ordinary mind constitutes property.

In Forster v. Scott, 136 N. Y. 584, 32 N. E. 977 (18 L. R. A. 543) Judge O'Brien said:

"Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the Constitution.  All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable and valuable in the title and possession."

In Pape v. New York & Harlem R. R. Co., 74 App. Div. 189, 77 N. Y. Supp. 734, Justice Ingraham said:

"It is sufficient to say that this provision of the Constitution 'is to have a large and liberal interpretation, and that the fundamental principle of free government, expressed in these words, protects not only life, liberty, and property in a strict and technical sense, against unlawful invasion by the government in the exertion of governmental power in any of its departments, but also protects every essential incident to the enjoyment of those rights.'  People v. King, 110 N. Y. 423 [18 N. E. 246 (1 L. R. A. 293, 6 Am. St. Rep. 389)]."

The easements of light, air, and access appurtenant to abutting lots constitute property rights protected by the Constitution, where the state has authorized the construction of an elevated railroad in a public highway.  Story v. N. Y. Elevated R. R. Co., 90 N. Y. 122, 43 Am. Rep. 146; Lahr v. Metropolitan El. R. Co., 104 N. Y. 268, 10 N. E. 528; Reining v. N. Y., L. & W. R. R. Co., 128 N. Y. 157, 28 N. E. 640, 14 L. R. A. 133; Muhlker v. Harlem R. R. Co., 197 U. S. 568, 25 Sup.

Ct. 522, 49 L. Ed. 872. In Matter of Brooklyn Union El. R. R. Co., 105 App. Div. 111, 93 N. Y. Supp. 924, a vault under a sidewalk of the city, constructed with the permission of the city authorities by the owner of the abutting buildings, was held to be an easement appurtenant to the abutting owner's premises and a species of property which could not be interfered with by the construction of an elevated road without making compensation. In Parish v. Baird, 160 N. Y. 306, 54 N. E. 725, Judge O'Brien says:

"Moreover, the vault over which the walk was laid, and of which it was a part, was an easement appurtenant to the plaintiff's property, and in itself a species of property which the plaintiff may protect as fully as any other property."

A franchise to take tolls for the use of certain locks and dams which had been constructed and maintained under competent authority by a navigation company has been held to be property for which compensation must be made; the court saying:

"The franchise is a vested right. The state has power to grant it. It may retake it as it may take other private property, for public uses upon the payment of just compensation." Monongahela Nav. Co. v. U. S., 148 U. S. 341, 13 Sup. Ct. 632 (37 L. Ed. 463).

A ferry franchise is property. Mayor v. Starin, 106 N. Y. 11, 12 N. E. 631. A franchise granted by a municipality to operate a street railway in a public highway is property. People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; Sixth Ave. R. R. Co. v. Kerr, 72 N. Y. 330; People v. Sturtevant, 9 N. Y. 263, 59 Am. Dec. 536.

There is no species of property which has been the subject of more litigation or been more jealously guarded than riparian rights, and these rights have universally been held to be property rights. Lewis, in speaking of the respective rights of the public and riparian owners on streams navigable in fact, says:

"These beneficiary rights are property, and within the protection of the Constitution. They are attached to the riparian property by nature, are universally estimated as part of its value in all the dealings between man and man, and should receive the protection of the law." Lewis, Em. Dom. § 73.

Again the same author says:

"Streams which are not navigable are wholly private property. The riparian owner, by means of dams, or otherwise, may make a reasonable use of the water as it flows over his land. An act of the Legislature declaring such a river public, or navigable, will not affect such rights, and the riparian owner cannot be deprived of the use of the water, or his private works on the stream interfered with, without compensation. Compensation must be made for all damages occasioned to private rights by improvements making such a stream navigable in fact." Lewis, Em. Dom. § 68.

Gould, in speaking of riparian proprietors upon both navigable and unnavigable streams, says:

"The right to the use of the water in its natural flow is not a mere easement or appurtenance, but is inseparably annexed to the soil itself. It does not depend upon user, or presumed grant from long acquiescence on the part of other riparian proprietors above and below, but exists jure naturæ as parcel of the land." Gould, Waters, § 204.

In speaking of the power of the Legislature to declare a stream a public one, Judge Cooley says:

"Though it is said that the Legislature of the state may determine whether a stream shall be considered a public highway or not, yet, if in fact it is not one, the Legislature cannot make it so by simple declaration, since, if it is private property, the Legislature cannot appropriate it to a public use without providing for compensation." Cooley, Const. Lim. (7th Ed.) 863; Morgan v. King, 35 N. Y. 454, 91 Am. Dec. 58.

Right of access to tide water, from land originally under water upon which a wharf had been built, granted with the right of wharfage, is property protected by the Constitution.

"The land under water with the right of wharfage was property belonging to it as a proprietor, which, it is believed, the state could not take without making compensation." Langdon v. Mayor, 93 N. Y. 159.

"This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation." Yates v. Milwaukee, 10 Wall. 504 (19 L. Ed. 984).

Rumsey v. N. Y. & N. E. R. R. Co., 133 N. Y. 79, 30 N. E. 654, 15 L. R. A. 618, 28 Am. St. Rep. 600, holds that the right of access which the upland owner has to the Hudson river, a tide-water stream, is a property right which cannot be taken from him without compensation by a railroad company, the construction of which has been authorized by the Legislature. In Saunders v. N. Y. C. & H. R. R. R. Co., 144 N. Y. 75, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729, the court held that a grant of land under the water of the Hudson river to a railroad company by the state did not extinguish or impair the easements or riparian rights of the owners of the uplands, such as the right of access to the navigable part of the river and the right to make a landing, wharf, or pier, and the right of passage to or from the same. In Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, it was held that the owner of upland adjoining Great South Bay had a right of access to the waters thereof from the front of his land, including the right to construct a pier on the land under water beyond high-water mark, for his own use or the use of the public. Matter of City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500, holds that an owner of upland abutting on the Harlem river, a tide-water stream, is entitled to compensation for the taking and destruction of his riparian rights by the appropriation of the tideway by the city of New York for a speedway. In Barnes v. Midland Terminal R. R. Co., 193 N. Y. 378, 85 N. E. 1093, 127 Am. St. Rep. 962, the question of relative rights in the foreshore of the ocean was concerned, and it was held that the public as well as the abutting owner had a right of passage.

While riparian rights are recognized as property, the question frequently arises, where there is an interference with these rights by the public, whether or not under the Constitution of this state the acts of the state amount to a "taking" of property. This inquiry sometimes occurs where the interference of the state arises from the exercise of its sovereign authority to improve navigation, sometimes where its

authority is exercised to protect the public under its police power, and sometimes where it seeks to appropriate private property for public uses under its power of eminent domain. Where the particular act of the state constitutes a "taking" of the property of the individual, he is entitled to compensation; but not every act causing damage to property is construed by the courts as a "taking." It is not easy to define, however, what constitutes such a "taking." Where there is an actual invasion of property, the problem is easy of solution; but where substantial damages occur without an actual interference with what is commonly known as property, the decisions have been various. Easements of access, light, and air attached to real property have been protected under certain conditions; but, where these easements are interfered with in the changing of the grade of a street, for instance, undertaken by the public authorities under the power to grade streets, in the absence of statutes allowing damages, the right therefor vanishes before the paramount right of the public. The use and the possession of real and personal property are fundamental, and yet there is no taking of such property where its destruction becomes necessary as a menace to the community under the police power of the state. It maintains its character as property, but there is no "taking" within the Constitution, because all property is held subject to the rule that it must not be used so as to constitute a menace to the public.

One of the rights of real property which is protected by the Constitution is the right of access; and yet two modes of ingress and egress to property will not be protected, and the public, under suitable authority, may close one highway leading to real property provided another exists or is provided. The closing of the second highway may seriously inconvenience the owner in the enjoyment of his property and may cause a depreciation in its value; but it is held not to be a "taking" of his property under the Constitution, because but one means of ingress and egress to property is contemplated by law. Even where the state seeks to acquire property under its power of eminent domain, it is often a difficult question to determine whether or not there has been a "taking" of property. By reason of the exercise of this power the owner may be seriously damaged, and yet may not be entitled to compensation for such damage, where it is regarded as too remote, or, as it is called in law, consequential in character. Not every injury, therefore, which an individual suffers as a result of the acts of the state in interfering with his property or impairing its value, constitutes a taking of the property so as to entitle him to compensation therefor. It may be stated, however, as the rule that, where there is a physical invasion of the property, whether in the exercise of the power of eminent domain or under the authority of the state to improve navigation, compensation must be made. Gould on Waters says:

"So the diversion, pollution, or other use of a private stream by public authorities, impairing, or destroying the rights of riparian proprietors to the water, is a taking for which compensation must be provided." Section 243.

Lewis, in his work on Eminent Domain, says:

"According to principles heretofore laid down, it follows that any injury to riparian rights for public use is a taking for which compensation must be made." 2d Ed. § 84.

In Gilzinger v. Saugerties Water Co., 66 Hun, 173, 21 N. Y. Supp. 121, affirmed 142 N. Y. 633, 37 N. E. 566, the plaintiff was a mill-owner with a water power on the Plattekill, a nonnavigable stream running through his premises.  The action was brought for the diversion of water from the stream upon which the mill is situated, and it was held that he could not be divested of his right to the natural flow of the stream, except upon just compensation and under the exercise of the right of eminent domain.

In Crooker v. Bragg, 10 Wend. 260, 25 Am. Dec. 555, it was held that, where the water of a river is divided by an island, so that only one-fourth of the stream descends on one side of the island, and the residue on the other, the owner of the shore where the largest quantity of water flows is entitled to the use of the whole water flowing there; and the owner of the other shore has no right to place obstructions at the head of the island to cause one-half of the stream to descend on his side of the river; and a stream of water cannot be diverted from its natural course without the consent of the owner over or by whose land it passes, although such owner may not require the whole or any part of it for the use of machinery.

The headnote of Commissioners of the Canal Fund v. Kempshall, 26 Wend. 404, which summarizes the decision, reads as follows:

"Fresh water rivers, to the middle of the stream, belong to the owners of the adjacent banks.  If navigable, the right of the owners is subject to the servitude of the public interest for passage or navigation.  The owners, however, are entitled to the usufruct of the waters flowing in the rivers, as appurtenant to the fee of the adjoining banks, and for an interruption in the enjoyment of their privileges in that respect, in consequence of public improvements made by the state, are entitled to compensation for damages sustained."

In the same case Senator Verplanck says:

"I cannot assent to the position that the conceded common-law authority of the state over such rivers for the purposes of navigation comprehends the right to divert the waters to other purposes of artificial navigation wholly distinct from that of the river itself.  The right of a public navigable highway on a river, if it be susceptible of it, or capable of being made so, is an easement or servitude which, like other servitudes, public or private, is to be exercised without intrusion on the other proprietary rights, beyond what is necessary for its due and fair enjoyment.  To consider this right of sovereignty as involving also an unlimited right to the use of the waters for other purposes of transportation, in another direction and channel, would be in contradiction to an acknowledged principle of the law of easements (already stated) that nothing passes as incident to a servitude but what is needed for the sufficient enjoyment of the right 'itself.'  The proprietor of the bed and banks of the stream has himself no absolute property in the waters, but strictly a usufructuary interest appurtenant to his freehold.  He can use the waters for his own benefit; but he may not divert them to the injury of his neighbors, or lessen their quantity, or detain them unreasonably.  If such be the strict limitation of the proprietary right, can it be that the state as the trustee of a special public servitude has a much less restricted right, and can divert or detain the waters, for other uses?  By its sovereign right of eminent domain, it undoubtedly may do so, just as its officers may, under state authority, enter upon and use the quarries or forests of private citizens for its public works; but all these exercises of sovereign authority are alike 'the taking of private property for public use,' which the Constitution pronounces may not be done, 'without just compensation.' "  Page 421 of 26 Wend.

In Yates v. Milwaukee, 10 Wall. 497, 19 L. Ed. 984, the plaintiff was the owner of a wharf on the Milwaukee river.  The Legislature of

Wisconsin passed an act authorizing the common council of Milwaukee to establish dock and wharf lines upon the banks of the river and to dredge the river, in the improvement of navigation. The common council declared the wharf a nuisance and an obstruction to navigation. This was not proved. The court held that, if the authorities deemed it necessary to remove the wharf in the prosecution of any scheme of widening the channel and improving the navigation of the Milwaukee river, they must first make compensation to Yates for his property so taken for the public use. The court said:

"On the whole we are of opinion that Shepardson, as riparian owner of a lot bounded by a navigable stream, had a right to erect this wharf, and that Yates, the appellant, whether he be regarded as purchaser or as licensee, has the same right; and that, if the authorities of the city of Milwaukee deem its removal necessary in the prosecution of any general scheme of widening the channel and improving the navigation of the Milwaukee river, they must first make him compensation for his property so taken for the public use." Page 507 of 10 Wall. (19 L. Ed. 984).

In Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557, the defendant, by the erection of a dam under authority of the state of Wisconsin and for the purpose of the improvement of the navigation of Fox river, flooded 640 acres of plaintiff's land; and the defendant urged that the damages were such as the state had a right to inflict in improving the navigation of the river without making compensation. The court held that the flooding constituted a "taking" within the Constitution, and said:

"We are not unaware of the numerous cases in the state courts in which the doctrine has been successfully invoked that for a consequential injury to the property of an individual arising from the prosecution of improvements of roads, streets, rivers, and other highways, for the public good, there is no redress; and we do not deny that the principle is a sound one, in its proper application, to many injuries to property so originating. And when, in the exercise of our duties here, we shall be called upon to construe other state Constitutions, we shall not be unmindful of the weight due to the decisions of the courts of those states. But we are of opinion that the decisions referred to have gone to the uttermost limit of sound judicial construction in favor of this principle, and, in some cases, beyond it, and that it remains true that where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle. Beyond this we do not go, and this case calls us to go no further." Pages 180 and 181 of 13 Wall. (20 L. Ed. 557.)

In United States v. Lynah, 188 U. S. 455, 23 Sup. Ct. 349, 47 L. Ed. 539, the petitioner brought suit in the Circuit Court for the District of South Carolina to recover of the United States compensation for certain real estate which it was alleged had been taken and appropriated by the United States. The taking and appropriation consisted in building across the Savannah river certain dams, training walls, and other obstructions, thus raising the level of the water and causing it to flow back upon the petitioner's plantation—raising the water thereon about 18 inches. The Supreme Court held that the improvement of the Savannah river in this case amounted to the taking of petitioner's property within the scope of the fifth amendment, and

that the government was under an implied contract to make just compensation therefor.

Cooley on Constitutional Limitations says:

"Although the regulation of a navigable stream will give to the persons incidentally affected no right to compensation, yet if the stream is diverted from its natural course, so that those entitled to its benefits are prevented from making use of it as before, the deprivation of this right is a taking which entitles them to compensation, notwithstanding the taking may be for the purpose of creating another and more valuable channel of navigation. The owners of land over which such a stream flows, although they do not own the flowing water itself, yet have a property in the use of that water as it flows past them, for the purpose of producing mechanical power, or for any of the other purposes for which they can make it available, without depriving those below them of the like use, or encroaching upon the rights of those above; and this property is equally protected with any of a more tangible character." 7th Ed., p. 807.

This view here taken, that the state cannot appropriate for purposes of the construction of the canal the riparian rights of the claimants without compensation, is not in conflict with any of the authorities. The case of Canal Appraisers v. People ex rel. Tibbetts, 17 Wend. 571, which reversed the same case in 13 Wend. 371, was confirmed in its doctrine to the Mohawk river by the case of Commissioners of the Canal Fund v. Kempshall, in 26 Wend. 404, and by later cases; and the case of People v. Canal Appraisers, 33 N. Y. 461, so far as it laid down any rules applicable to other streams than the Mohawk river, which was the stream involved in the case, was overruled by Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393, and other later cases. In the case of Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592, where the city of New York undertook to improve the Harlem river, and in so doing interfered with the right of access to the river by the upland owner, there was no land to which riparian rights were attached; and the bed of the Harlem river, a tide-water stream, was not owned by the owner of the upland, but by the city of New York. The case of Barnes v. Midland Terminal R. R. Co., 193 N. Y. 378, 85 N. E. 1093, 127 Am. St. Rep. 962, involved the foreshore of the ocean. The question of taking land for the improvement of navigation was not in the case. It was simply a question as to the relative rights of the owner of the upland and the general public in the foreshore. The case of Matter of City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500, known as the "Speedway Case," did not involve the question of the right of the city to improve the navigation of the Harlem river; and in that case the court found that the owner of the upland was entitled to compensation for the taking and destruction of his riparian rights by the appropriation of the tideway by the city of New York. In Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996, the improvement was confined wholly to the channel of the river, and the damages were held to be "incidental consequences of the lawful and proper exercise of the governmental power." In Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126, a dike was constructed on submerged land to which the upland owner had no title; and there was no physical invasion of the property of the plaintiff, although he

was deprived of the right of access by reason of the presence of the dike. In the case at bar there was an actual physical invasion and taking of land to which riparian rights were attached.

These riparian rights cannot be taken under the power of eminent domain, because they constitute property, as we have shown, protected by the Constitution; and for the same reason they cannot be taken under the power of the state to improve navigation. The river, at the place opposite claimants' premises and for some distance south and north thereof, is a nonnavigable river and is not subject to the public easement of navigation. The state, therefore, could not, if it desired, construct this canal in the channel of the river, without making compensation to claimants for any injury to the riparian rights which remained in them after the appropriations for the old canal.

Not only is it not within the power of the state to construct and improve the channel of the river without making compensation for injuries to claimants' riparian rights, but the state is not seeking to make the improvement at this point in the river itself, but outside the channel of the river. At no time has the state used the river opposite claimants' premises as a channel for through traffic. North of their property, the east portion of the pond created by the river was boomed off; but ever since the construction of the original canal the channel has passed around the dam at Fulton into the still water created by the dam lower down the stream. Even if the state had the right to improve the navigation of the stream itself, without making compensation for damages incidentally occasioned thereby, it cannot construct its work outside the regular channel and claim exemption from damages.

Lewis, on Eminent Domain, says:

"The public right is a right of passage only, including the right to improve the navigation. It is necessarily limited to the bed of the stream. * * * The public easement in a private navigable stream includes not only the right to use, but also the right to improve. The public may make such changes and construct such works in the bed of the stream as may be deemed necessary to promote its usefulness and efficiency as a highway." 2d Ed., § 71.

The work across claimants' premises cannot be considered as an improvement of the navigation of the river, even upon the plea that some time in the distant past the land occupied by the claimants must have been under water and constituted a part of the bed of the river. As far back as the evidence in this case goes, the property has always been occupied for private purposes and has formed no part of the regular channel of the stream.

The foregoing authorities sufficiently sustain the position that, in this case, under the common law, disregarding for the moment the statute under which the improvement is being made, the state cannot appropriate rights attached to the land of claimants without compensating them therefor. The tendency of judicial construction is to give full force to the provision of the Constitution of the United States and of the several states requiring compensation to be made where private property is taken for public use, whether such use is required for the improvement of a navigable stream or body of water or in the construction of an enterprise not associated with water courses. This

trend of legal authority is shown by the decisions in the United States Supreme Court in the cases of Yates v. Milwaukee, supra, Pumpelly v. Green Bay Canal Co., supra, United States v. Lynah, supra, and in Scranton v. Wheeler, supra, which was decided by a divided court, the dissenting judges holding that the right of access to the stream in which the owner of the upland had no title to the bed of the stream was property and as such was protected against invasion by the state, even by the construction of a dike upon the submerged land. Mr. Justice Shiras says:

"I think this question may well be answered in the words of Gould in his work on Waters (2d Ed. p. 151): 'When it is conceded that riparian rights are property, the question as to the right to take them away without compensation would appear to be at an end.' "

The state, however, in the present instance, has not been proceeding under its power to improve the navigation of the river. The statute under which the state is proceeding provides for compensation; and, whether we treat the acts of the state as being exercised under its power of eminent domain or under its power to improve navigation, compensation was contemplated and is provided for under the statute under which the proceedings in the present case are being conducted. Under the common law there was no liability for damages for changing the grade of streets; but this liability has been changed in very many cases by statute. It is equally within the power of the state to proceed under the common law to improve the navigation of a stream and thus exempt itself from liability for incidental damages, but it may also provide for compensation in such cases. O'Connor v. Pittsburgh, 18 Pa. 190; Transportation Co. v. Chicago, 99 U. S. 635, 25 L. Ed. 336; U. S. v. Alexander, 148 U. S. 186, 13 Sup. Ct. 529, 37 L. Ed. 415; People v. N. Y., O. & W. Ry. Co., 133 App. Div. 476, 117 N. Y. Supp. 1048.

The preceding discussion brings us down to the present appropriation by the state, notices for which were served August 6 and October 2, 1906. At the outset we are met by the question as to the extent of the appropriation, arising from the fact that the notices specify in two cases all the riparian rights as having been taken, while the plans for the improvement placed in evidence provide for openings in the new pier. The question has arisen as to whether the plans modify the notices so as to limit the extent of the water rights taken by the state to the actual necessities of the canal. In times of high water there will be an abundant supply of water both for the canal and the water right owners; and, if the state is appropriating, so far as these claimants are concerned, only what is necessary for the canal, allowance should be made for the water which they will still be permitted to use. There is no doubt that the state has the right to appropriate to itself the water backed up by its dams and also the right to dispose of this surplus water for the development of power, so long as it does not thereby injure a lower riparian owner who may be entitled to the surplus flow over the dam. It was in this view of the state's rights that the openings were provided in the dam, and not with the idea of modifying the

appropriations made by the state. These appropriations are governed by the notices filed and served, which are the complete and final determination by the state of the "lands, structures and waters" taken and are not subject to modification by plans for the improvement subsequently made. The notices of appropriation, when duly filed or served as required by the statute, operate as a transfer to the state of the interests therein described; and thereafter it is merely a question of the amount of compensation that the owner should receive for the property appropriated. The appraisal therefor will proceed upon the assumption that the state has appropriated from the claimants the land described in the notices of appropriation and all the riparian rights owned by the claimants.

The conclusion of the court is that the Oswego river is nonnavigable in every sense of the term at the location of claimants' property and for some distance north and south thereof; that the title of claimants extends to the center of the river; that their title to the upland upon which the power plant, Kenyon mills, and Genesee mills were or are located is confirmed by more than 40 years of adverse possession; that the canal work at the location of the premises where the canal passes around their property is not an improvement of the navigation of the Oswego river under the power of the state to improve navigation; that the state had prior to the present appropriation acquired only such water from the Oswego river as was necessary to operate the old Oswego Canal; that, subject to the rights of the state to supply the old canal with water, the claimants were entitled to the use of so much water as was available through the two openings in the pier under an 11.8-foot head as they existed at the time of the present appropriation and to an opening in the hydraulic canal sufficient for 510 cubic feet of water per second under a 12-foot head; that the claimants were not entitled at the time of the appropriation to any additional openings in the pier without the consent of the state nor to any openings in the hydraulic canal in excess of that above stated; that the state has appropriated all of the riparian rights of the claimants; that the state has by statute provided for compensation; that this is a proceeding for determining such compensation, and claimants are entitled to the value of their property taken, including riparian rights, and to the damages to the remainder of the property not taken, with interest from the date of appropriation and the expense of abstracts of title.

Taking all of these considerations and other facts presented by the evidence into account, and after a view of the property, claimants should be allowed for the appropriation made from the power plant property with the water rights belonging to it and to the Kenyon and Genesee mills properties, taking into consideration the damages to the remainder of their property, its distributing plant, and the fact that it is to have the bridge extending across the present canal taken away, the sum of $275,000; for the appropriation of the Kenyon mills property they are entitled to the sum of $8,000; for the appropriation of the Genesee mills property the sum of $15,000; and for the appropriation of the bridge across the old canal the sum of $1,000—together

making a total award of $299,000, with interest thereon from the dates of appropriation, respectively, and the expense of procuring abstracts of title.

Judgment for claimants.

SWIFT and MURRAY, JJ., concur.