THE PEOPLE'S GAS AND ELECTRIC COMPANY OF OSWEGO, NEW YORK, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(State of New York, Court of Claims, December, 1918.)

Damages — rental value — provisions of barge canal contract that water power should not be interfered with — evidence — canal "blue line."

Claimant's electric lighting plant is located upon a strip of land between the state navigation canal and the Oswego river which was leased to its predecessors in 1835 and in 1846 under a title to the land to the very margin of the canal and they have continuously been in the actual use and occupation without question upon the part of the state. The plant was mainly operated by water brought from an hydraulic canal built by the state between 1826 and 1828, under the state navigation canal by two conduits six feet square ending at the west face of the west wall of said canal and discharging at that point into claimant's forebay which was built up against said face of said wall and from which claimant drew water directly to its water wheels and claimed to have been developing about 350 horse power. The barge canal contract at this place provided that claimant's water power should not be interfered with but when the contractor reached this point in the work claimant was notified on August 16, 1910, by the state department of public works that the conduits, which claimant held under a lease, were about to be destroyed and that new ones would be furnished claimant some distance south of the old conduits, but discharging upon or opposite claimant's property, and suggesting that if claimant desired to avail itself of the new conduits that it submit plans for the extension of its forebay in such manner as to utilize the water from the new conduits. On August 22, 1910, the old conduits were torn out by the state contractor, the canal enlarged and its west line moved so as to render claimant's forebay absolutely useless and all access by claimant to the hydraulic canal was cut off. The new conduits which were not completed until November 25, 1912, were about ninety feet south of the position of the old

conduits and no notice of any formal appropriation of any of claimant's property was at any time served upon claimant. *Held,* that though claimant's forebay was constructed partly if not wholly within the "blue line" as laid down on the Holmes Hutchinson map of 1834, made by authority of the canal commissioners, the fact that for fifty years during which claimant and its predecessors remained in the continued occupation of the property by the consent of and without objection on the part of the state establishes beyond all question that no actual appropriation of said property for canal purposes was ever made by the state of New York.

It was the duty of claimant to connect up its forebay with the ends of the new culverts within a reasonable time after they had been constructed, so as to reduce its damages.

Claimant is entitled to recover its damages for the reconstruction of its forebay and the rental value of its plant from the 22d day of August, 1910, until the 25th day of May, 1913, with interest on the award for rental value from the dates respectively of filing its first and second claim.

The records of claimant showing the value to it of its electric light plant was admissible in evidence.

CLAIM for damages because of an alleged infringement of property rights.

George N. Burt (Charles A. Collin, Harry C. Mizen, of counsel), for claimant.

Merton E. Lewis Attorney-General (Edward J. Mone, Deputy Attorney-General), for state.

ACKERSON, P. J.    Prior to the barge canal construction authorized by chapter 147 of the Laws of 1903, there existed on the easterly bank of the Oswego river in the city of Oswego the hydraulic canal of the Oswego Canal Company, and adjoining it on the west the state navigation canal, and between the state navigation canal and the Oswego river a strip of land on which was located various factories and industries.

On this strip of land was situated an electric lighting plant known as the Citizens Lighting plant which was operated by this claimant in manufacturing electricity used mainly, if not entirely, for electric lighting. This plant was operated mainly by water power. The water was brought from the hydraulic canal under the state navigation canal by means of two conduits six feet square, ending at the west face of the west wall of the navigation canal and discharging there into claimant's forebay which was built up against the west face of the west wall of the navigation canal, and from which forebay claimant drew the water directly on to its water wheels, where it claims to have been developing at this time by this water about 350 horse power.

The claimant in the year 1910 was interrupted in the operation of its plant at this place by having its water power shut off by the operations of the barge canal contractor who removed the two conduits above mentioned. The barge canal contract at this place was known as No. 35, which contract was let by the state to the Gilmore-Horton-Allen Company. This contract provided that claimant's water power should not be interfered with, but when the contractor reached this point in his work the claimant was notified on the 16th day of August, 1910, by the department of public works of the state of New York that the conduits above mentioned through which the claimant received its water from the hydraulic canal under the leases which it held with said canal company, were about to be destroyed and that new conduits would be furnished claimant some distance south of these old conduits, but discharging upon or opposite claimant's property, and suggesting that if claimant desired to avail itself of these new conduits that it submit plans for the extension of its forebay in such a manner as to utilize the

water from said new conduits. Thereafter, and on or about the 22d day of August, 1910, the aforesaid conduits through which claimant had for a long number of years received its water were torn out by the state contractor. The canal was thereafter enlarged at that point, and the westerly wall of the canal was moved seven feet to the west, thereby rendering claimant's forebay absolutely useless and cutting off all access by claimant to the hydraulic canal. The new conduits to which the department of public works referred in its letter of August 16, 1910, were not completed until about November 25, 1912, and were about ninety feet south of the position of the old conduits: No notice of any formal appropriation of any of claimant's property was at any time served upon the claimant.

Owing to this alleged encroachment or infringement of the state of New York upon claimant's property and rights, the claimant now brings this action against the state to recover two things: *First,* the usable value of its said property known as the Citizens Lighting plant from August 22, 1910, to August 22, 1916; *second,* the cost of restoring its property to the condition in which it was prior to the interference by the state on August 22, 1910.

In order to ascertain the respective rights of the state and of this claimant in the water rights and real property here in question, we must go back to the origin of things in this locality. By chapter 241 of the Laws of 1823, the state of New York incorporated the Oswego Canal Company. This company was authorized by this act to build a hydraulic canal along the easterly bank of the Oswego river under the supervision of an engineer designated by the canal commissioners. It authorized said company to divert water from the Oswego river at or above the Oswego rapids,

so called, by means of dams or moles constructed in the border of said river to an extent sufficient to fill said canal, and it further authorized said company " to sell, let or grant and convey, for a limited time, the use of the water which shall be conveyed in said canal, for mills or other hydraulic purposes, to any person or persons owning and occupying lands adjoining thereto." Then section 10 of the said act was as follows:

" X. And be it further enacted, That if at any time hereafter it shall become necessary to adopt the said canal as a part of the contemplated improvement between Lake Ontario and the Erie Canal, the canal commissioners shall at all times have full power, in behalf of the state, to enter upon and make all necessary ·alterations that by them shall be deemed advisable, to take and make use of the waters therefrom, for the use and purposes of filling and supplying all locks that may be constructed to connect the said canal with Lake Ontario; and the said canal shall thereafter become the property of this State, without any payment or compensation whatever to said company: Provided however, That the right to all the surplus waters of said canal, shall be vested in the company hereby incorporated, and all persons legally claiming under them; and that they shall be permitted to take, and make use of, and enjoy the surplus waters of said canal, not necessary for filling or supplying the locks that may be erected by the said canal commissioners."

Thereafter, the legislature, by chapter 279 of the Laws of 1824, passed an act entitled "An Act to connect the Erie Canal with the waters of Lake Ontario and the St. Lawrence," in and by which the construction of the first Oswego canal by the state was authorized. In and by virtue of this act and the aforesaid

section 10 of chapter 241 of the Laws of 1823, the state took over and completed the hydraulic canal of the said Oswego Canal Company for the purpose of a navigation canal, as well as a hydraulic canal, and made it a part of the first Oswego canal. It will be observed, however, that this incorporation by the state of this Oswego Canal Company's hydraulic canal in and as a part of the state canal system did not in any way interfere with or change the rights theretofore granted by the state to the said Oswego Canal Company in and to all the surplus waters of said canal. The right to the surplus waters of said joint navigation and hydraulic canal, over and above what was necessary for navigation purposes, by said acts, became vested in the Oswego Canal Company, and all persons legally claiming under it. The said joint navigation and hydraulic canal, it is conceded in this case, was built by the state between the years 1826 and 1828. The real property in question upon which is located the said electric lighting station, was leased to claimant's predecessors in title in 1835 and in 1846. The leases describe the said property as lots that had been subdivided in 1825, describing the eastern boundaries of said lots as extending to the "margin of the canal," and then follows this language: "Reserving, nevertheless, to all persons a right of way across said subdivision lots number 7 and 8, free from all obstructions, of 25 feet in width along the westerly margin of the canal." These leases were executed by said canal company in 1835 and 1846.

Some time prior to 1834 there was erected upon the aforesaid lots a saw mill which drew water directly through the westerly bank of said canal. In 1834 a civil engineer by the name of Holmes Hutchinson, under authority from the canal commissioners, made

what is known as the blue line map of that year.  This blue line is represented on this map as being parallel with the canal at this point, and thirty-three feet distant westerly from the inner or front angle of the canal as it existed in 1834.  By sections 4 to 8, part 1, chapter 9, title 9, article 1, of the First Revised Statutes, it was provided that this map should be presumptive evidence in all judicial and legal proceedings that the lands included within the boundary of the blue lines laid down in said map have been appropriated by the state; and such presumption was also further provided for by section 6 of chapter 451 of the Laws of 1837.  It will be observed, however, that the leases above referred to of this property made in the years 1835 and 1846, although having been made after the running of this blue line and after the supposed appropriation of the property between the blue line and the canal at this point had been made by the state, make no mention or indication that any of this property was owned by the state, but simply reserve a right of way twenty-five feet wide along the margin of the canal.  Thereafter, and about the year 1846, a large flouring mill was constructed upon this property, and about the situation where the saw mill had been, which drew the water for its power directly from the westerly bank of the canal at this point through a wooden flume.  This flouring mill was operated under what is known as the Eno and Cochran leases from the said Oswego Canal Company, which secured to the lessees " water sufficient to propel, with the most approved machinery, three runs of mill stones," in one lease, and in the other lease " water sufficient to propel, with the most approved machinery, one run of mill stones." The claimant's rights in the property in question are based on the said Eno and Cochran leases which had

been regularly assigned to this claimant. There was much evidence in the case as to the quantity of water to which claimants and their predecessors in title were entitled to draw from this canal under the aforesaid leases. The evidence ranged all the way from water enough to develop from fifteen to about sixty horse power for a run of mill stones. The claimant asserted that at the time of the interruption in 1910 it had installed and was operating a pair of thirty-nine-inch horizontal Camden water wheels of a total capacity of about 350 horse power, which were connected with an electric generator of 200 kilowatt capacity; that its right to use that amount of water had never been questioned by the canal company, nor the right of its predecessors to sufficient water to run a large flouring mill, which was known as a four-run mill and had a capacity of 400 barrels of flour in twenty-four hours. The evidence discloses that this must have taken about 225 cubic feet of water per second.

The state offered in evidence receipts delivered by the Oswego Canal Company to the Citizens Lighting Company, all of which contain this provision: " Unless otherwise agreed, a run of water will be deemed 11¾ cubic feet per second under a 16 foot head, and its equivalent under a lower head." But all the facts in this case indicate that the claimant and its predecessors have continually had at their disposal sufficient water to develop from 200 to 300 horse power on this property, and that these leases actually secured to them sufficient water to develop at least 160 horse power.

In 1854 the state proceeded, at this point, to build a navigation canal separate and apart from the hydraulic canal. The hydraulic canal was constructed on the easterly side of the navigation canal, with the

towpath of the navigation canal transferred from its westerly bank to its easterly bank, which separated it from the hydraulic canal. The westerly bank of the canal was at this time moved to the west eight or ten feet.

As the surplus waters of this canal had been vested in the Oswego Canal Company and those claiming under it by the act of 1823, and as the state had now separated the lessees of this canal company from the new hydraulic canal which was built for the sole purpose of containing such surplus waters, it became the statutory duty and obligation of the state to connect these lessees with the source and supply of this surplus water which had been vested in them. In order to do this, it constructed two conduits beneath the navigation canal at this point, each six feet square, terminating at the westerly face of the westerly wall of the new canal, which was completed in about the year 1857. Claimant's predecessor in title then constructed its forebay, made of masonry, up to the westerly face of the west wall of the canal, as completed in about the year 1857, to receive the waters from these new conduits, and continued to receive the waters to which it was entitled under its leases with the Oswego Canal Company through such forebay down to the time that said conduits were torn out in 1910. This covered a period of over fifty years during which time claimant and its predecessors had remained in the continued occupation of this property by the consent of and without objection of the state of New York.

In the year 1896 the state expended $4,285 for rebuilding or repairing the culverts which connected claimant's property with the hydraulic canal. The state apparently recognized its obligation to maintain

these water powers not only at that time, but afterwards when the barge canal was built by stipulating in barge canal contract No. 35 that claimant's water power should not be interfered with, and also by stipulating that the contractor should build two new culverts to take place of the old ones which were torn out.

Claimant's property has remained to this day in the same condition as the state left it after the barge canal was completed. Neither the state nor the claimant has reconstructed claimant's forebay so as to receive the water from the new culverts.

The state's reply to claimant's contention that it is entitled to damages consisting of the usable value of its plant for each year that it has been separated from its water power, and for the value of reconstructing its forebay is that the state is not under any obligations to pay any damages to the claimant, because the claimant's forebay was built upon state property and was within the blue line, and that therefore the state had a right to remove such forebay; that it also had a right to remove the conduits in question as it was necessary to remove them in barge canal construction, and it claims that the fact that claimant was shut off from its water power was one of the incidental results of the prosecution, without negligence and without trespass upon claimant's property, of the work of improving the canal, a public work authorized by statute.

We will now proceed to examine these contentions of the state. *First,* was claimant's forebay constructed upon state property, and was it within the blue line as laid down on the Holmes Hutchinson map of 1834? A great deal of evidence has been offered in this case upon that proposition. More evidence has

been offered to elucidate this point, both by the claimant and by the state, than upon any other proposition in the case. Eminent engineers who have studied the history of the canal and have examined the field notes of all the engineers who have been connected with the work upon the canal, from Holmes Hutchinson down, have pointed out to the court their reasons for contending that this forebay was or was not within the blue line. I am of the opinion that under the very careful investigation, examination and research of the records connected with the construction of the Oswego canal by Richard E. Phillips, who has long been connected with the engineering department of this state, and by the very able and lucid explanation which he has made of the significance of those records to the court, we must conclude that it has been fairly established that said forebay was constructed partly, if not wholly, within the blue line, as the said line is laid down on the Holmes Hutchinson map of 1834.

But does this fact standing alone relieve the state from this claim for damages by the claimant? As I have heretofore pointed out, the statutes of this state at one time provided that the Holmes Hutchinson blue line map of 1834 should be presumptive evidence that the lands within its boundaries have been appropriated by the state. In this case the state rests upon that presumption alone, in order to establish the fact that claimant's forebay was situated on state property. The laws which made the Holmes Hutchinson map presumptive evidence of the fact that the property within the blue line had been appropriated by the state were repealed prior to the time of the invasion of claimant's property here by the state. Sections 4 to 8, part 1, chapter 9, title 9, article 1 of the First Revised Statutes were repealed and re-enacted in a new form

16

Court of Claims, December, 1918.    [Vol. 105.

in the old Canal Law of 1894 (Laws of 1894, chap. 338), and when the Consolidated Laws were enacted in 1909 this statute was again specifically repealed, Laws of 1909, chap. 13. Chapter 451 of the Laws of 1837 was also repealed in 1894 and 1909 by the Canal Laws above mentioned. The state contends, however, that although the Canal Laws of 1894 and 1909 did in terms repeal the earlier acts making the Holmes Hutchinson map presumptive evidence, nevertheless the legislature did not, as a matter of fact, intend to bring about this result, and that a reasonable construction of sections 4 and 5 of the Canal Laws as passed in 1894 and 1909 continued the legal presumption attached to said map by the earlier statutes. Whether the state is right in this contention or not we do not at this time deem it necessary to decide. But whatever the effect of the above mentioned statutes the Holmes Hutchinson map may still be considered by the court as evidence on this point, as an ancient document, along with the other evidence in the case bearing upon claimant's title. It seems to me that the claimant has fairly met and overcome whatever probative worth could properly be given to such map either as an ancient document or under any of the statutes above mentioned; and that notwithstanding the fact that the land on which claimant's forebay was constructed appears to be within the blue line, as it is laid down on the Holmes Hutchinson map of 1834, yet in fact the state never appropriated and went into possession of such land. From the very earliest time in the history of the canal, and even before the construction of the navigation canal, it would appear that claimant's predecessors in title had been in the actual and undisputed possession and occupation of this property. The description of the property in the

leases shows that the boundaries extended to the very margin of the canal. No right of the state therein is recognized. A saw mill was constructed on this property, run by water from the canal, at a very early day. Then came the wooden flume of the later mill, extending up to the wall of the canal through which the water came to the mill. This was followed by the building of claimant's forebay against the west wall of the canal, where the state itself recognized its legal existence by terminating its conduits at the west face of the west wall of the canal. In other words, the claimant and its predecessors from the earliest times in the history of the canal have not only actually been in possession of this land under a title of the land to the very margin of the canal, but they have also continuously been in the actual use and occupation of that land without any question by the state, and the state in the building of its conduits, and in other ways, has recognized this title of the claimants and their predecessors. Here, as in the *Fulton Light, Heat & Power Case,* 65 Misc. Rep. 263; affd., 200 N. Y. 400, we must judge somewhat of the rights of the parties and the facts as to this alleged appropriation by what the parties have actually done in reference to the same over a long period of years. All of these facts in this case demonstrate that although Holmes Hutchinson did include this property within his blue line, yet the dominion over this property, the use and occupation of this property, and the recognition by the state of such rights on the part of the claimant, establish, we think beyond all question, that no actual appropriation of this property for canal purposes was ever made by the state of New York.

The next question we come to in this case, it seems to me, is whose duty was it to reconstruct this forebay

and connect up the claimant with its water power.
The claimant contends that it was the duty of the
state; that although it, the claimant, was satisfied that
it was the owner of this property, or at least was
entitled as a matter of law to its use and occupation,
that nevertheless, inasmuch as the state denied this
proposition, and claimed that the land on which the
new forebay must be constructed was within the blue
line and the property of the state, the claimant, by
reason of such claim on the part of the state, was
thereby relieved from the necessity of reconstructing
this forebay until that question was judicially deter-
mined, and that in the meantime the claimant might
sit by and collect the annual usable or rental value of
this property from the state.  I do not think that this
position of the claimant is tenable.  Without any
reference as to whether the state or the claimant
owned this property, the claimant knew that the state
had recognized the right of it and its predecessors to
use this property in utilizing the water from the
hydraulic canal in which it had a vested right.  The
state had recognized this right of the claimant over a
long period of years, and had only disturbed its occu-
pation of this property when necessary to construct
the barge canal.  But even then the state, in its con-
tract with the barge canal contractor who performed
the work opposite claimant's premises, provided and
stipulated that he must not interfere with claimant's
water power, and on the 16th day of August, 1910, the
state had specifically invited the claimant to extend its
forebay so as to utilize the new culverts.  In fact, the
building of the culverts to connect claimant with its
water power, both in 1854 and in 1912, was a direct
and specific invitation to the claimant and its predeces-
sors to come to the ends of those culverts with its

forebay, and a recognition of their right to do so. It was the duty of the claimant in the premises here to connect up its forebay with the ends of these new culverts within a reasonable time after the construction of such culverts. This claimant, like all others whose rights have been invaded in a similar manner, was bound, so far as it reasonably could, to reduce its damages.

As has been well said in the case of *Hall Sons Co.* v. *Sundstrom & Stratton Co.,* 138 App. Div. 548; affd., 204 N. Y. 660: "It would be the duty of plaintiff, as soon as he reasonably could, to repair the damage which interfered with the use of his property and prevented him from carrying on his business. He could not suffer his mill or factory to remain indefinitely in a ruinous and dilapidated condition so that no business could be there carried on, and look to the wrongdoer to pay over to him as damages a sum equal to that which by his own industry and application he might otherwise have earned. If the injury was of so serious a character that repair was impossible, it would be his duty to seek another place in which to establish and carry on his business, only looking to the wrongdoer for reimbursement until such time as that could be accomplished by the exercise of reasonable diligence."

The state invaded claimant's rights and its property and cut off its water power on the 22d day of August, 1910. It had completed the new culverts by the 25th day of November, 1912, and it contends that if the state is liable to the claimant for the annual usable or rental value of its water power, that it was not liable after the 25th day of November, 1912. I cannot agree with this contention. I think we must hold, in justice to the claimant, that it was entitled to a rea-

sonable time after the construction of the new conduits in which to build a new forebay to connect up with such conduits. I think that it would be fairly and justly entitled, upon the evidence in this case, to a period of six months after November 25, 1912, or until the 25th day of May, 1913, and that, therefore, the claimant would be entitled to recover from the state the rental value of its property from the 22d day of August, 1910, until the 25th day of May, 1913.

It is not an easy matter, from the evidence in this case, to determine at what sum the rental value should be fixed. The claimant contends that the damages to this property should be based on the usable value of the Citizens Lighting plant to the claimant, or, at least, that the evidence of its usable value to the claimant should be received and considered by the court in determining at what figure the rental value of the property should be fixed. I think the claimant is sound in this latter contention. In the above mentioned case of *Hall Sons Co.* v. *Sundstrom & Stratton Co.* the court used this language: " In the case of a temporary as distinguished from a permanent infringement of defendant's rights, the true measure of damages has been held to be (Joyce on Nuisances, Sec. 488) the diminution in usable value of the property. And in certain cases that has been defined to mean the value of the use of the premises to the occupant, as distinct from the rental of the premises named in the lease thereof by the owner to the tenant."

The claimant offered in evidence its records showing the value to it of this electric light plant in question. The court at the time deferred its decision upon the admissibility of such evidence until such time as it came to decide the case. I am of the opinion, after an examination of the authorities, that such evidence was

admissible and that it should be admitted as a part of the record in this case. The state's objection is therefore overruled and an exception given to the state. Based upon these records, the evidence of the claimant was that the usable value of this Citizens Lighting plant from which the state shut off the water power to the claimant was from $12,000 to $13,750 per year before its water power was shut off, and that after that time its usable value to the claimant was nothing.

On the other hand, the state contends that when the water was shut off from the Citizens plant that the efficiency of its lower plant, known as the plant of the Peoples Gas and Electric Company, became greatly enhanced, because it was able to use the water there which it had theretofore used at the Citizens plant, and that the shutting down of the water at the Citizens plant did not damage the claimant in any manner whatever. The claimant arrives at this usable value above mentioned by a very long and intricate computation from its records. One of its own witnesses stated that no such value could be given as the mere rental value of this plant. The state's witnesses Newton, Horton and Landreth have created very much doubt as to the accuracy of the claimant's computation as to usable value.

I firmly believe that the evidence in this case clearly discloses that the element of usable value per annum of this plant to the claimant is a matter of great uncertainty. Newton testifies that it had absolutely no usable value to the claimant. Horton testifies to the same thing. Landreth testifies that the rental value of this plant was $3,500 per year, and that such amount was more than its usable value. Horton testifies that the annual rental value of this plant was not

to exceed $3,000 a year. I think from all the evidence
in the case we may safely say that this plant had an
annual rental value of $6,000 per year.

The case of *Reisert* v. *City of New York*, 174 N. Y.
211, which case the claimant here relies upon to estab-
lish the measure of damages in this case, contains the
following language: " The nature of the case appears
to be such that proof of the rental value, before and
after the establishment of the defendant's pumping
station, is difficult to be made. Hence, the usable value
of the premises, which, if not synonymous with rental
value, has, as a term, an equivalent sense, should be
allowed to be shown."

It seems to me, therefore, that under the ruling of
that case, inasmuch as the usable value is much in
doubt here, but that the annual rental value of such
plant can be reasonably ascertained, that the court
should fix the annual rental value as the measure of
damages. It is very evident, however, that Horton
and Landreth, in fixing upon this rental value, did not
give the claimant the benefit of either the actual water
that it was using or of the water that it was entitled
to use under its leases. It not only, as I have hereto-
fore stated, was entitled to water enough to develop
at least 160 horse power, but it had free access, and
had for many years, to water sufficient to develop at
least upwards of 200 horse power. It was not, under
its leases, entitled to all of this, but there can be no
doubt that the rental value of such a plant would be
fixed not only upon what water it was legally entitled
to use under its leases, but also what additional
amount it was permitted to use without objection. We
must conclude, therefore, from all the evidence in this
case, which demonstrates the actual amount of water
the claimant was entitled to use under its leases and

the additional amount that it was always permitted to use without objection, that the rental value of this plant was at least $6,000 per year, and that they were entitled to this rental value of $6,000 per year from the 22d day of August, 1910, until the 25th day of May, 1913.

Now, in this connection, we will consider the state's contention that the state does not become liable in any event for tearing out these conduits and shutting off claimant's water power, because it was incidental to the performance of a public work carried on without carelessness or negligence, in pursuance of statutory authority. With this contention of the state I am unable to agree. In the first place, the contractor who tore out these culverts or conduits was operating under a contract with the state which by its terms provided that he should not interfere with claimant's water power. For some reason unknown to the court that stipulation in the contract was entirely ignored, and in ignoring and violating this stipulation of the contract the contractor apparently had the consent and approval of the state. It by no means appears in this case that it was necessary to the canal construction at this place that this water power of the claimant should have been cut off. On the other hand, I believe that it affirmatively appears that the canal construction might have been carried out without for one moment interfering with claimant's water power. Of course, it would have been more expensive for the contractor, and perhaps it was the matter of expense alone which induced both the contractor and the state to ignore the provision of the contract in respect to the claimant's water power above referred to. In the second place, the destruction of claimant's water power was not *incidental* to the construction of the

canal at this point, but it was the direct result of it. It is true that this construction of the canal at this point was a public work performed under statutory authority, but the state was under equal obligation, provided by statute, to build the barge canal and likewise to maintain claimant's water power.

The facts of this case entirely distinguish it from the ordinary case of a person who suffers injury which is incidental to a public work performed under statutory authority, for here the injury was the direct result of such work, and the injury consisted in a violation of the claimant's rights which the state was under statutory direction to maintain.

The state calls our attention to the fact that when the hydraulic canal was separated from the navigation canal, and two distinct canals were made, in 1854 and the following years, that the water power users in this locality were deprived of their water, and the board of canal commissioners, which was then composed of several eminent men, including Judge Selden, and Sanford E. Church, afterwards chief judge of the Court of Appeals, held that they were not entitled to damages, and they continued to hold so after the legislature had passed an enabling act giving them power to award damages to water power users in this vicinity at that time, provided they found that such award would be consistent with the law, and the canal commissioners at that time based their refusal to make an award upon section 10 of the act incorporating the Oswego Canal Company, being chapter 241 of the Laws of 1823.

At that time when the matter was up before the canal commissioners as to whether or not they should make an award to persons whose water power was cut off while the alterations were being made in the canal,

whereby the hydraulic canal was separated from the navigation canal, Judge Church, who was then comptroller of the state, said, in relation to the right of the state to cut off this water power at that time, contrary to the views of the other commissioners: " I am inclined to believe that the right expressly conferred upon the Canal Commissioners (in section 10 of Chapter 241 of the Laws of 1823) to enter and make the necessary alterations, expires with the time, where by the terms of the act, the title of the canal vests in the State, and that the contemplated alterations, specified in the act, were designed to precede the ownership of the State."

He then uses this language: " When the State became the absolute owner of the property, it seems to me that they possessed by virtue of such ownership the incidental right of entering upon and making all necessary repairs or alterations which might be deemed advisable for the purposes of the canal, without subjecting itself to liability for the payment of damages, and that the grant of surplus waters is necessarily subject to this right."

It will be seen from this, I think, that Judge Church correctly stated the reasons for relieving the state from liability at that time. The state was the absolute owner of the canal. It must necessarily follow that when the state drew all the water out of the canal in order to repair it there would be no surplus water for the lessees of the Oswego Canal Company, and the state must of necessity have this right in order to properly take care of and maintain its navigation canal. But here a different situation obtains. The Oswego Canal Company had been placed back in its original position with its separate canal. Under the act of 1823, the Oswego Canal Company was authorized to maintain this canal and lease its waters for

hydraulic purposes. The state had no right to cut off that water unless it became necessary for navigation purposes. When barge canal construction was commenced the Oswego Canal Company was in the same position, with its separate canal, as it was before its canal was united with the navigation canal. The state had no more right to interfere with the flow of water to its lessees from this hydraulic canal than it would have had if said hydraulic canal had never been incorporated in the navigation canal. So long as chapter 241 of the Laws of 1823 remained on the statute books giving to the Oswego Canal Company the right to maintain this separate canal and lease its waters for hydraulic purposes, the state could not interfere with those rights, except for the purpose of maintaining navigation on its navigation canal without either, *first,* repealing the act of 1823, or, *second,* becoming liable in damages to the lessees of the Oswego Canal Company for depriving them of their vested rights in such water. *Haselo* v. *State,* 73 Misc. Rep. 532; *Lakeside Paper Co.* v. *State,* 45 App. Div. 112; *Waller* v. *State,* 144 N. Y. 579.

We next come to the proposition of restoring the claimant's forebay. Inasmuch as claimant's forebay was situated on its own property, the state, when it destroyed it, became a trespasser and must respond to the claimant in such damages as will enable claimant to build a new forebay as good and efficient as the one destroyed by the state. The state contends that all that it is necessary to do is to extend the walls of the piece of claimant's forebay that is left so as to connect up with the ends of the new conduits; but this would not give claimant any such forebay as it had before the state invaded its property, and the claimant strenuously contends that such forebay would be entirely insufficient for its purposes. The engineers

of the claimant testify that it would cost anywhere from $23,062 to $24,424.20 to rebuild such a forebay as the claimant possessed before the construction by the state of the barge canal. The state engineers say that what is left of the present forebay walls could be extended to include the new conduits at an expense of about $10,000, and that such forebay would be entirely sufficient and adequate for claimant's purposes. In this we cannot entirely agree with the state. The state ruthlessly invaded claimant's property and rights, and the claimant is entitled to be reimbursed for the construction of a forebay fully as good and adequate as the one the state destroyed. We believe the sum of $17,000 is fully sufficient for such purpose.

Now comes the question of whether the claimant is entitled to interest on the award. The claimant is certainly not entitled to interest on that portion of the award which is to reimburse claimant for reconstructing its forebay, for the reason that up to date it has not expended that money, but under the authority of *Lakeside Paper Co.* v. *State,* 45 App. Div. 112; 55 id. 208, and also the case of *Wilson* v. *City of Troy,* 135 N. Y. 96, we believe that the claimant is entitled to interest on such portions of the demand for the rental value of claimant's property as the court has awarded to the claimant, from the date of filing of the respective claims. This would give interest on $12,000 from the 17th day of August, 1912, the date of filing the first claim, and interest on $4,549.32 from August 17, 1914, the date of filing the second claim.

Findings have been made and filed herein by the court in accordance with the views set forth in this opinion.

PARIS and WEBB, JJ., concur.

Ordered accordingly.